# UNITED STATES DISTRICT COURT

NORTHERN   DISTRICT OF   ILLINOIS, EASTERN DIVISION

FILED
MAY 23 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

STEFANIE GIESSELBACH and
MAGNUS VON BUDDENBROCK

MAGISTRATE JUDGE ASHMAN

CRIMINAL COMPLAINT

08 CR 417   CASE NUMBER: 08CR 417

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. From in or about September 2006 to the present, in Chicago Illinois, Cook County, in the Northern District of Illinois, defendants:

conspired and agreed with each other and with others known and unknown to commit the following offenses against the United States:

(1) to knowingly and willfully, with intent to defraud the United States, make out and pass, and attempt to pass, through the customhouse false and fraudulent invoices and other documents relating to the importation of honey into the United States, in violation of Title 18, United States Code, Section 545; and

(2) to introduce and deliver for introduction into interstate commerce, with intent to defraud and mislead, a food that is adulterated, namely honey containing the antibiotic chloramphenicol, in violation of Title 21, United States Code, Sections 331(a) and 333(a)(2); and

one or more of the conspirators did an act to effect the object of the conspiracy; all in violation of Title 18, United States Code, Section 371.

I further state that I am a Special Agent with the United States Department of Homeland Security, Immigration and Customs Enforcement (ICE) and that this complaint is based on the following facts:

See attached affidavit of Special Agent Susan J. Jensen

Continued on the attached sheet and made a part hereof:  _X_ Yes   ___ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

May 23, 2008                                                at  Chicago, Illinois
Date                                                            City and State

_____                     _____
Magistrate Judge Martin C. Ashman                           Martin C. Ashman
Name & Title of Judicial Officer

| | |
|---|---|
| STATE OF ILLINOIS | ) |
| | ) SS |
| COUNTY OF COOK | ) |

## AFFIDAVIT

Susan J. Jensen, being duly sworn according to law, do depose and state as follows:

1. I am a Special Agent with the United States Department of Homeland Security, Immigration and Customs Enforcement (ICE), and have been so employed for two years. I am currently assigned to the Commercial Fraud Unit and I am responsible for investigating violations of federal law relating to, among other things, the importation of merchandise into the United States that constitutes adulterated food product or that has been presented to the customhouse for acceptance through the use of false and fraudulent documentation or practices concerning the origin of the merchandise.

2. The information set forth in this Affidavit is based on my personal knowledge as well as information obtained through, among other sources, other law enforcement officers and governmental agencies, public records and computer database searches, witness and informant interviews, and documents and records seized during the execution of a search warrant.

3. The information contained in this affidavit is provided for the limited purpose of establishing probable cause to believe that STEFANIE GIESSELBACH and MAGNUS VON BUDDENBROCK conspired with each other and others to defraud the United States and to commit offenses against the United States, namely (a) to fraudulently and knowingly import and bring into the United States merchandise, namely honey, contrary to law, in

violation of Title 18, United States Code, Section 545; and (b) to introduce and deliver for introduction into interstate commerce, with intent to defraud and mislead, a food that is adulterated, namely honey containing the antibiotic chloramphenicol, in violation of Title 21, United States Code, Sections 331(a) and 333(a)(2). This affidavit does not contain all the details and facts known to me or that have been compiled concerning this investigation.

### DEFENDANTS AND RELATED ENTITIES

4. Alfred L. Wolff, Inc. or Alfred L. Wolff GmbH (collectively "ALW") is the food ingredients component of the Wolff & Olsen group of companies. Wolff & Olsen maintains its headquarters office in Hamburg, Germany. Wolff & Olsen, through ALW, is a worldwide distributor of, among other food products, honey and honey-based products and derivatives. ALW maintains a satellite office in Chicago, Illinois. ALW's Chicago Office is ALW's operational base in the United States. ALW, at least in part through its Chicago Office, imports substantial quantities of honey into the United States. Between 2005 and 2008, Afffiant believes that ALW's Chicago Office imported nearly $30 million of honey into the United States.

5. GIESSELBACH has been the National Sales Manager for ALW's Chicago Office since approximately November 2006. GIESSELBACH is responsible for ALW's purchase OR importation and sale of honey in the United States.

6. VON BUDDENBROCK has been the General Manager of ALW's Chicago Office since approximately late 2006. As the General Manager, VON BUDDENBROCK is responsible for the operations of the entire ALW Chicago Office.

## THE IMPORTATION OF MERCHANDISE INTO THE UNITED STATES

### General Procedures

7. The section of the Department of Homeland Security known as Customs and Border Protection ("CBP") is responsible for, among other things, the examination of merchandise into the United States to ensure that it is admissible and in compliance with United States laws and the assessment and collection of duties, taxes and fees on imported merchandise.

8. An importer such as ALW or its designated agent must file entry documents with CBP concerning the merchandise. 19 U.S.C. § 1484. The entry documents, such as Customs Forms 3461 and 7501, must provide specific information relating to the imported merchandise. The merchandise is not considered to have legally entered into the United States until the shipment has arrived at the port of entry, CBP has authorized its delivery, and the importer or its agent has taken custody of the merchandise. An importer's agent, or customhouse broker, normally has power of attorney for the importer and completes the entry documents based on information provided by the importer.

9. CBP enters information about all shipments entering the United States, including those entering through Chicago, into a computer system known as the Automated

Commercial System ("ACS"). ACS targets a certain percentage of merchandise for physical inspection and examination. If no physical examination takes place, however, a CBP official reviews the entry documents and any ACS-based data to determine whether the documentation is complete and in order. The CBP official relies on the truth and accuracy of this information to determine whether to approve the entry of the merchandise into the United States. The CBP official, upon approval of the merchandise, signs Customs Form 3461 in order to release of the shipment into commerce. The execution of Customs Form 3461 is called a "general entry." When physical examination does not occur, the CBP official's determination regarding the release of a shipment into commerce is based on the truth and accuracy of the information contained in the entry documents and the data entered into ACS concerning importation.

10. There are different tariff codes assigned in order to identify the type of product being imported into the United States. An importer is required to use tariff code number 0409.00.0044 on Customs Form 3461 or other entry documents for shipments containing honey.

**Anti-Dumping Duties**

11. Anti-dumping duties are assessed on imported merchandise that is sold, or is likely to be sold, in the United States at less than fair market value in order to offset the advantage acquired by certain imported merchandise over competing United States goods. The duties are designed to stop or deter importers from "dumping" merchandise at below

cost in the United States for the purpose of grabbing market share by driving domestic manufacturers out of the market.

12. The United States Department of Commerce ("Commerce Department"), the International Trade Administration ("ITA"), and CBP each enforce various aspects of anti-dumping laws. The Commerce Department, for example, determines whether merchandise is sold at less than a fair market value and the amount of duties that must be assessed. The ITA determines if imports are injuring a United States industry. CBP, in turn, assesses and collects the duties once the Commerce Department and the ITA have made the necessary determinations.

13. The Commerce Department and ITA, through Case Number A570-863-000, have determined that anti-dumping duties should be imposed on the importation of honey from the People's Republic of China. The default duty rate is, with some limited exceptions, approximately 221% for Chinese-manufactured honey imported into the United States. This default rate became effective July 11, 2007.

### Importation Regulations and Statutes Concerning Adulterated Foods

14. The United States Food and Drug Administration ("FDA") is responsible for enforcing the provisions of the Food, Drug, and Cosmetic Act ("FDCA"). 21 U.S.C. § 301 *et seq.* The FDA, through the FDCA, ensures that foods are safe, wholesome, sanitary, and properly labeled.

15. The FDCA defines "food" to include "articles used for food or drink in man or other animals." 21 U.S.C. § 321(f)(1), (2), and (3). The FDCA prohibits the introduction into interstate commerce of an adulterated food (2 U.S.C. § 331(a)) and the receipt and delivery in interstate commerce of an adulterated food (21 U.S.C. § 331(c)). A food is deemed adulterated if, among other reasons, it bears or contains a new animal drug that is unsafe within the meaning of 21 U.S.C. § 360b. *See* 21 U.S.C. § 342(a)(2)(C)(ii). Section 360b requires that an animal drug be deemed unsafe unless there is in effect an approval of an application with respect to such use or intended use and such drug conforms to that approved application. The use of a new animal drug not in conformity with an approved application generally causes that use to be deemed unsafe for the purposes of 21 U.S.C. § 342(a)(2)(C)(ii) and, therefore, a food bearing or containing such drug is deemed adulterated.

16. On October 18, 2002, the FDA issued Import Alert #36-03 titled "Detention Without Physical Examination of Honey Due to Chloramphenicol." ("Import Alert"). Chloramphenicol is a broad spectrum antibiotic that is used to treat serious infections in humans. Chloramphenicol is not approved for use in food producing animals, including bees, and none of the applicable exemptions to the food additive approval process or the new animal drug approval process apply to its use in honey bees. The Import Alert noted, among other things, that all shipments of honey from specific companies in the People's Republic

of China, Vietnam, Malaysia, Thailand, Mexico, and Peru should be detained upon importation into the United States without physical examination.

17. Honey containing chloramphenicol is subject to refusal of admission into the United States pursuant to Section 21 U.S.C. § 381(a)(3) because it is unsafe (21 U.S.C. § 360b) and adulterated (21 U.S.C. § 342(a)(2)(C)(ii)).

18. Affiant has confirmed through the Center for Veterinary Medicine (CVM), the entity within the FDA that regulates the manufacture and distribution of new animal drugs that will be given to animals, that chloramphenicol is not approved for use in any food producing animal and that the presence of chloramphenicol in food produced by animals is considered adulterated within the meaning of 21 U.S.C. § 342(a)(2)(C)(ii).

## ALW's TRANSSHIPMENT OF CHINESE HONEY

19. Between February 12, 2008 and February 20, 2008, ICE agents took samples from nine separate containers of honey that ALW had imported into the United States through Chicago. At the time, ALW's nine honey containers were stored at a commercial facility in Itasca, Illinois used by CBP to examine merchandise imported into the United States. The documentation accompanying the nine ALW honey containers reflected that the honey was a product of Russia, that is, that the honey had been produced in, and exported from, Russia. Russian honey, unlike honey from China, is not subject to anti-dumping duties.

20. The ICE agents sent the nine samples of honey from ALW's containers to a CBP laboratory in Savannah, Georgia in order to determine the origin of the honey in the

7

samples. The origin of honey may be detected through laboratory analysis due to the detectable presence of natural soil residue in the honey. The soil residue can be attributed by the laboratory to specific geographic locations. The testing on the samples from the nine ALW containers revealed that three out of the nine containers tested positive for Chinese honey. ALW's entry documentation for all nine containers, however, reflected that the containers held Russian honey. The identification of the honey in the containers as originating in Russia, if true, meant that ALW did not owe any anti-dumping duties on the nine containers. The total entered value of the nine containers of honey was $309,548.00.

21. On or about March 24, 2008, ICE agents interviewed GIESSELBACH as she arrived at O'Hare International Airport in Chicago on a flight from Frankfurt, Germany. GIESSELBACH told the agents that she was aware that ALW had been transshipping Chinese honey since before she and VON BUDDENBROCK had joined the company. Transshipping refers to the shipment of a product from one country to another so as to make it appear that the product originated from a country other than its actual country of origin. GIESSELBACH stated that she and VON BUDDENBROCK had become aware of the details of and the process surrounding ALW's transshipment of Chinese honey while training under their predecessors in the ALW positions that GIESSELBACH and VON BUDDENBROCK currently held. GIESSELBACH explained that the Chinese honey producer that ALW used shipped drums of Chinese honey to a producer of honey in Russia. GIESSELBACH stated that the drums of Chinese honey would then be containerized with

Russian honey for importation into the United States. GIESSELBACH stated that the Russian producer provided ALW with original country of origin certificates for the honey that the Russian company produced, but that those certificates only reflected the actual Russian honey. GIESSELBACH explained that the entire container of honey would then be declared as being of Russian origin in order for ALW to avoid paying anti-dumping duties even though the container held drums of Chinese honey. GIESSELBACH also stated that the containers from Russia, which held both Russian and Chinese honey, might be recontainerized once again in Korea before being shipped to the United States. GIESSELBACH told the ICE agents that, since she became ALW's National Sales Manager, she had tried to decrease the amount of Chinese honey being transshipped and imported into the United States.

## ALW'S IMPORTATION OF ADULTERATED HONEY

22. On May 14 and 15, 2008, ICE identified a Confidential Informant ("CI 1"), who formerly worked for ALW in Chicago for less than two years. CI 1 worked in the importation and sale of honey in the United States and provided information regarding ALW's importation and sale of foreign honey within the United States. CI 1 stated that it is common knowledge among ALW executives, including GIESSELBACH, that shipments of imported ALW honey frequently were contaminated with antibiotics that have been banned by the FDA.

23. CI 1 stated when an ALW customer would test a shipment of honey and reject it based on the presence of antibiotics, GIESSELBACH regularly would re-test the shipment to confirm the customer's claim. CI 1 stated that GIESSELBACH regularly would divert that shipment to a different customer, who did not know or did not care about the contamination.

24. CI 1 stated that shipments of honey that ALW had identified as contaminated would frequently go to Company B in Texas, as the executives at this business did not care that the shipments were contaminated. CI 1 understood that Company B would purchase contaminated honey from ALW at a discounted rate. CI 1 further stated that contaminated loads also were frequently sent to Company C in Michigan, because the owner of Company C seemed to trust ALW and did not conduct regular testing for contaminants.

25. On or about March 24, 2008, the Honorable Arlander Keys authorized a search warrant of ALW's Chicago Office. During the execution of the search warrant, ICE agents seized a variety of documents, correspondence, shipping records, electronic records, and other items relating to ALW's importation of honey into the United States and ALW's distribution of the imported honey within the United States.

26. These documents revealed at least one importation by ALW of what GIESSELBACH knew to be adulterated honey into the United States. The honey in this shipment was adulterated because it contained chloramphenicol. The history of this ALW shipment is outlined below.

a. On or about September 13, 2006, ALW prepared a purchase order for the acquisition of 57,000 kilograms (57 metric tons) of what was identified as "Polish Light Amber Honey." The purchase order amount of the honey was $97,755.00. The order was prepared on a purchase order form bearing ALW's logo and an address of an ALW office in Park Ridge, Illinois. The purchase order listed the vendor as "Alfred L. Wolff Honey GmbH Attn.: Stefanie Giesselbach" in Hamburg, Germany. The purchase order reflected that the honey was to be shipped to "Alfred L. Wolff, Inc." in Park Ridge, Illinois. The second page of the purchase order contained a notation about "Quality" which stated in pertinent part "CAP free, free of Fluroquinolones otherwise as per US Food regulations. Nitrufuran free." "CAP" is an abbreviation for chloramphenicol.

b. On or about September 25, 2006, ALW entered into an Agreement to Purchase with Company A in Wisconsin. The Agreement to Purchase contained as a "Special Condition" that the "Quality" would include "CAP ND" and that the "Seller warrant[ed] [the shipment to be] pure honey, not adulterated or misbranded within the meaning of the Federal Food, Drug, & Cosmetic Act."

c. Between on or about November 7, 2006 and on or about November 9, 2006, a laboratory in Germany called "Institut fur Honig-Analytik Quality Services International GmbH" printed reports as to testing on three samples of the purported Polish Light Amber Honey involved in the Company A shipment. The report for Samples 995-1 and 995-2 reflected that the sample of honey contained less than 0.3 parts per billion ("ppb")

of chloramphenicol and therefore below detectable levels. The report for Sample 995-3 reflected that the sample of honey contained 0.6 ppb of chloramphenicol. The report for Sample 995-3 also reflected that, based on the analysis of the pollen content, the "geographical origin" of the alleged "Polish Light Amber" honey was "mainly Southamerica, (+ possibly China)." (The reports for Sample Nos. 995-1 and 995-2 did not contain sheets reflecting any pollen analyses performed on these two samples.)

      d.     The ALW shipment of Polish Light Amber honey entered the United States through Chicago on or about November 16, 2006. The CBP "Entry Summary" reflected that the "Country of Origin" for the shipment was "PL" [Poland].

      e.     According to ICE records, GIESSELBACH entered the United States on or about November 5, 2006, and remained in the United States until on or about December 21, 2006.

      f.     At some point in or around late November 2006 or in or around early December 2006, after the Polish Light Amber shipment arrived in the Chicago area, Company A rejected the order.

      g.     On or about November 30, 2006, Individual A, an employee of ALW with an email address with the notation "@alwolff.us" in his email address, received an email from ALW overseas. The email informed Individual A that "we must blend CAP somewhere off [sic] or we have to sell at given prices. Unfortunately with all the costs involved shipment to India is also not very atractiv [sic]." The email from overseas included a "cc"

to GIESSELBACH at "sgiesselbach@alwolff.us". On or about December 3, 2006, Individual A sent a reply email, with a copy to GIESSELBACH at "sgiesselbach@alwolff.us" reflecting that Individual A had spoken to Company B in Texas about the "Polish Light Amber" honey shipment but that if Company B were to purchase the shipment it would do so at a price deduction of $500 to $700 per metric ton. The email stated, in part, that "I can speak very open with [Company B] about this issue. But if they buy this load you have to be assure that they buy it with a price deduction of 500 to 700$ / MT we will not be able to sell it as contracted price of 1700 CFR. Please let me know your instrucition [sic] as the load cost you money every day in the warehouse."

  h. On or about December 8, 2006, Individual A, with GIESSELBACH as a "cc" on the email address listed above, received an email from ALW overseas directing Individual A to "effect the sales" to Company B in Texas. On that same day, December 8, 2008, GIESSELBACH sent an email to Company B in which she advised a Company B representative about the "bargain" for "1 FCL" of "Polish LA [Light Amber] Honey." GIESSELBACH then received a responsive email from Company B reflecting that Company B had mailed a check that day in the amount of $105,233.00. Records reflect that the adulterated honey was subsequently shipped to Company B in Texas.

  27. GIESSELBACH has resigned or otherwise been transferred from her position as National Sales Manager for ALW's Chicago Office. GIESSELBACH has arranged to

leave the United States to Germany today, on May 23, 2008. In doing so, GIESSELBACH has vacated the residential unit she was occupying in Chicago, Illinois.

## ALW'S IMPORTATION OF CHINESE HONEY

28. Among the documents seized pursuant to the search warrant described in Paragraph 25, above is an email chain that revealed at least one anticipated or completed importation by ALW of what VON BUDDENBROCK knew to be Chinese honey, but which GIESSELBACH and VON BUDDENBROCK, were aware would be claimed as honey originating from the Ukraine. The history of this email chain is outlined below.

   a. Specifically, on or about March 20, 2008, Individual B, an employee of ALW with an email address with the notation "@alwolff.de" in his email address, responded to an email from GIESSELBACH from the same day, asking in German "can they offer china [sic] buckwheat [i.e., honey] origin Ukraine raw material. CFR [cost of insurance and freight] Chicago." Affiant believes that the substance of this request from GIESSELBACH is whether Individual B can obtain Chinese-origin honey, which is to be claimed as Ukrainian honey, and if so, at what cost, factoring in insurance and freight.

   b. Individual B responded to GIESSELBACH, with a "cc" to VON BUDDENBROCK at "mvb@alwolff.us" that "If we ship as any other origin we can probably only invoice as honey! Otherwise we get troubles with the authorities here - to [sic] obvious that it is chinese [sic] origin." Individual B also addressed other unrelated questions to VON

14

BUDDENBROCK in the same email. VON BUDDENBROCK responded by email to Individual B's email.

29. Based on a computer query by CPB agents, Affiant believes VON BUDDENBROCK has arranged to leave the United States to Germany, with his wife, on May 29, 2008.

FURTHER AFFIANT SAYETH NOT.

_____
Susan J. Jensen
Special Agent
Immigration and Customs Enforcement

SUBSCRIBED and SWORN to before me
this 23rd day of May 2008.

_____
MARTIN C. ASHMAN
United States Magistrate Judge