15

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**
3-22-12
MAR 2 2 2012

JUDGE AMY ST. EVE
United States District Court

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 08 CR 417-10 |
| vs. | ) | |
| | ) | Judge Amy J. St. Eve |
| MAGNUS VON BUDDENBROCK | ) | |

## PLEA AGREEMENT

1.    This Plea Agreement between the United States Attorney for the Northern District of Illinois, PATRICK J. FITZGERALD, and defendant MAGNUS VON BUDDENBROCK, and his attorney, JEFFREY STEINBACK, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(c)(1)(C) and Rule 11(c)(1)(B), as more fully set forth below.  The parties to this Agreement have agreed upon the following:

### Charge in This Case

2.    The superseding information in this case charges defendant with knowingly concealing, covering up, falsifying, and making a false entry in corporate records with the intent to impede, obstruct, and influence an investigation by, and the proper administration of, a matter before the United States Department of Commerce, and in relation or contemplation thereof, in violation of Title 18, United States Code, Section 1519.

3.    Defendant has read the charge against him contained in the superseding information, and that charge has been fully explained to him by his attorney.

4.    Defendant fully understands the nature and elements of the crime with which he has been charged.

2

## Charge to Which Defendant is Pleading Guilty

5.     By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the superseding information, which charges defendant with knowingly concealing, covering up, falsifying, and making a false entry in corporate records with the intent to impede, obstruct, and influence an investigation by, and the proper administration of, a matter before the United States Department of Commerce, and in relation or contemplation thereof, in violation of Title 18, United States Code, Section 1519.

## Factual Basis

6.     Defendant will plead guilty because he is in fact guilty of the charge contained in the superseding information.  In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt and constitute stipulated conduct pursuant to Guideline §1B1.2:

On or about January 3, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, MAGNUS VON BUDDENBROCK ("VON BUDDENBROCK") and others known and unknown to the Grand Jury, with the intent to impede, obstruct, and influence the United States Department of Commerce's investigation and proper administration of QHD Sanhai Honey Co., Ltd.'s ("QHD") new shipper review, and in relation or contemplation thereof, did knowingly falsify and make a false entry in Alfred L. Wolff, Inc.'s ("ALW USA") corporate records to cover up that three ALW USA-issued debit notes, which were falsely labeled as claims for moisture, color, and relabeling defects relating to purchase order 1174, were fraudulent, and so as to conceal that in fact the debit notes were intended to reimburse ALW

3

USA for antidumping duties, customs duties, and fees paid by ALW USA on CBP entry E94-1030975-7 for the honey purchased from QHD pursuant to purchase order 1010 that was subject of the new shipper review, in violation of Title 18, United States Code, Section 1519. VON BUDDENBROCK committed this crime within the scope of his employment at ALW USA and with the intent to benefit ALW USA and ALW Food Group.

As more fully set forth below, VON BUDDENBROCK's criminal conduct was part of a larger, broader conspiracy to which VON BUDDENBROCK was an active member and hereby stipulates to pursuant to Guideline §1B1.2. The purpose of this conspiracy was to fraudulently import and enter Chinese-origin honey into the United States to avoid the payment of antidumping duties by falsely declaring to the United States Department of Homeland Security, Bureau of Customs and Border Protection ("CBP") that the honey originated from countries other than China (including Russia, India, Indonesia, Malaysia, Mongolia, Philippines, South Korea, Taiwan, and Thailand); submitting false documents to the United States Department of Commerce ("DOC"); and selling fraudulently-imported honey to United States customers, including honey of different origins adulterated with antibiotics. Specifically, beginning in or about April 2007 and continuing until in or about May 2008, VON BUDDENBROCK agreed and conspired with others to defraud the United States and to commit offenses against the United States, to wit:

a. To fraudulently and knowingly import and bring into the United States merchandise, that is, honey, contrary to law, namely, Title 18, United States Code, Section 542, and sell and facilitate the transportation and sale of such merchandise, knowing the same to have been imported into the United States contrary to Section 542, in violation of Title 18, United States Code, Section 545;

4

b.    To introduce and deliver for introduction into interstate commerce, with intent to defraud and mislead, honey that contained unsafe food additives, namely, antibiotics, that rendered the honey adulterated under the FDCA, in violation of Title 21, United States Code, Sections 331(a), 333(a)(2), 342(a)(2)(C)(i), and 348(a); and

c.    To knowingly alter, destroy, conceal, cover up, falsify, and make false entries in records and documents with the intent to impede, obstruct, and influence an investigation by, and the proper administration of, a matter before the United States Department of Commerce, and in relation or contemplation thereof, in violation of Title 18, United States Code, Section 1519.

More specifically, defendant VON BUDDENBROCK is a citizen and national of the Federal Republic of Germany. Between approximately November 2002 and May 23, 2008, VON BUDDENBROCK was employed by Alfred L. Wolff GmbH in Germany ("ALW Germany") and Alfred L. Wolff Inc. ("ALW USA"). ALW Germany has several subsidiaries, affiliates, and offices, including ALW USA; Alfred L. Wolff Honey GmbH in Germany ("ALW Honey"); Alfred L. Wolff (Beijing) Trade Co. Ltd., China ("ALW Beijing"); and Alfred L. Wolff Company Ltd. Hong Kong, China ("ALW Hong Kong"), previously operating as Kirkam Co. Ltd. (all collectively, "ALW Food Group"). Acting together – and for the benefit of each other – ALW Food Group sourced, supplied, manufactured, purchased, and sold ingredients and food products, including honey.

To carry out this conspiracy, VON BUDDENBROCK worked with, received assistance and support from, and otherwise discussed and facilitated criminal conduct with Gong Jie Chen of QHD Sanhai Honey Co., Ltd. ("QHD"), and the following ALW Food Group employees, managers, and executives: Alexander Wolff, Jürgen Becker, Stefanie Giesselbach, Tom

5

Weickert, Marcel Belten, Yi Liu, Sven Gehricke, Thomas Marten, and Thomas Gerkmann (all

collectively "ALW Food Group Executives"), each of whom is further described below:

**Alexander Wolff** held different titles at ALW Germany, including Managing Director and General Manager, and functioned as the Chief Executive Officer from about 2003 through about 2010, in which position he controlled the operations of ALW Food Group and directed ALW Food Group Executives. Alexander Wolff also acted as the General Manager of ALW Hong Kong in or before 2003. From about 2005 Alexander Wolff also held positions within ALW USA, including Treasurer, Secretary, Chairman, member of the Board of Directors, and served as President of ALW USA from about January 2006 to about January 2007.

**Jürgen Becker** was the co-Managing Director of ALW Honey until approximately 2010, and oversaw ALW Food Group's honey business in Europe. Becker advised and consulted with ALW Food Group Executives regarding the acquisition of honey by ALW Beijing, its financing and transportation by ALW Hong Kong, and its importation and sale in the United States by ALW USA.

**Tom Weickert** succeeded Alexander Wolff as the General Manager of ALW Hong Kong from about 2003 through about 2005. In about 2007 Weickert became the co-Managing Director of ALW Honey in Germany and worked with Becker managing ALW Food Group's honey business in Europe, where he advised and consulted with ALW Food Group Executives regarding the importation and sale of honey in the United States.

**Marcel Belten** succeeded Weickert as General Manager of ALW Hong Kong from about August 2005 to about 2009, where he coordinated the shipment and financing of Chinese honey acquired by either ALW Hong Kong or ALW Beijing, and the importation of the honey to the United States by ALW USA.

**Yi Liu** was the General Manager of ALW Beijing, where he located, arranged, and sourced honey from China on behalf of ALW Food Group for importation into the United States.

**Sven Gehricke** served as the General Manager of ALW Hong Kong before 1999, when he became the first General Manager of ALW USA until late 2003. In 2003, Gehricke became the General Manager of Alfred L. Wolff S.A. de C.V., in Mexico City, Mexico (ALW Mexico), where he remained deeply involved in the importation scheme on behalf of ALW Food Group. Between 1999 and about

2006, Gehricke held other positions at ALW USA, including Chairman, President, Treasurer, and Secretary.

**Thomas Marten** succeeded Gehricke as General Manager of ALW USA from about January 2004 to about August 2007. From about 2006, Marten also held other positions at ALW USA, including President and Treasurer. Marten reported directly to Alexander Wolff.

**Thomas Gerkmann** was ALW USA's National Sales Manager – Bee Products from about December 2003 to December 2006, where he reported to Marten. Gerkmann oversaw the purchase of bee products, including honey; the importation of honey into the United States, including maintaining relationships with customhouse brokers; and the sale of honey to United States customers.

**Stefanie Giesselbach** was trained by Gerkmann to succeed him as ALW USA's National Sales Manager – Bee Products in November 2006, a position she held until May 2008. Prior to becoming ALW USA's National Sales Manager, Giesselbach was employed at ALW Germany as Head of Honey Sales in about 2003.

**Gong Jie Chen** acted as Sales Manager for QHD's honey sales, and coordinated QHD's new shipper review application before the United States Department of Commerce. Chen also sourced and arranged Chinese-origin honey from China on behalf of ALW Food Group for importation into the United States. Chen used Wuhan Shino-Food Trade Co. Ltd ("Wuhan Shino"); CRC Foodstuff Inc ("CRC Foodstuff"); Vistta Inc. ("Vistta") and other entities to process, ship, import, and enter Chinese-origin honey and honey products into the United States.

VON BUDDENBROCK participated in this conspiracy within the scope of his employment at ALW USA and with the intent to benefit ALW USA and ALW Food Group. VON BUDDENBROCK knew that there were certain internal ALW Food Group "policies" or "rules" that VON BUDDENBROCK was expected to abide by, and otherwise directly practiced, so that ALW Food Group could reduce the chances of its illegal practices being detected by United States authorities. Specifically, as part of the conspiracy, VON BUDDENBROCK, his co-conspirators, and others:

7

a.   authored, transmitted, received, and approved emails, including emails containing code words dealing with the conspiracy;

b.   sought to limit their use of emails when discussing transshipping and honey adulteration-related matters and instead purposefully communicated by telephone and in foreign languages, including German, to avoid detection by United States law enforcement authorities;

c.   communicated using instant messaging, including Skype, and personal email accounts rather than official business email accounts; and

d.   purposefully deleted emails and instant messaging chats dealing with the conspiracy.

### The Government's Imposition of Antidumping Duties

In October 2000, the DOC initiated an investigation concerning whether honey from China was being sold in the United States at less than fair market value (the "Honey Investigation"). In December 2001, the DOC determined that Chinese-origin honey was being sold into the United States at artificially low prices. As a result, the United States government imposed default antidumping duties on Chinese-origin honey (the "Honey Order"). Between 2001 and approximately July 2007, antidumping duties on Chinese-origin honey were as high as approximately 221% and, later, $2.06 per net kilogram of honey through the end of 2008.

After the imposition of antidumping duties on Chinese-origin honey in 2001, companies not listed in the Federal Register as being permitted to import Chinese-origin honey at a reduced individualized antidumping duty deposit rate were subject to the default antidumping duty rate on honey from China. Between January 2002 and January 2009, honey originating from Russia, India, Indonesia, Malaysia, Mongolia, Philippines, South Korea, Taiwan, and Thailand was not subject to antidumping duties upon importation and entry into the United States.

### *Introduction into the Conspiracy*

VON BUDDENBROCK moved to ALW USA's Chicago office in approximately September 2006. In approximately April 2007, VON BUDDENBROCK met Thomas Marten in Chicago, where Marten revealed to VON BUDDENBROCK that ALW Food Group was importing and entering Chinese-origin honey into the United States using fraudulent and false documentation. Marten told VON BUDDENBROCK that Chinese-origin honey was entering the United States with false Russian certificates of origin that looked authentic. Marten explained to VON BUDDENBROCK that this scheme was used to avoid U.S.-imposed antidumping duties and that it had "worked well for years and [wa]s foolproof." When VON BUDDENBROCK began taking notes during this meeting, Marten told him to stop and to not discuss the details of their conversation with others. VON BUDDENBROCK understood Marten's introduction to the conspiracy to be in preparation for VON BUDDENBROCK assuming the role of ALW USA's General Manager and so that VON BUDDENBROCK could participate in and also continue to assist his co-conspirators in carrying out the conspiracy.

In August 2007, VON BUDDENBROCK replaced Marten as the General Manager for ALW USA's operations. VON BUDDENBROCK physically worked in the United States with Stefanie Giesselbach to carry out this conspiracy through May 2008.

### *Importation of Honey by Means of False Statements*

As General Manager, VON BUDDENBROCK reported directly to Alexander Wolff and was responsible for the operations of ALW USA's office, including approving contractual arrangements, and authorizing and wiring payments for honey illegally imported and entered into

9

the United States. VON BUDDENBROCK was also in charge of ALW USA's accounts payable, accounts receivable, budget forecasts, and he had bank signing authority. By virtue of his position, VON BUDDENBROCK approved, facilitated and allowed ALW Food Group's criminal schemes to continue.

Between approximately September 2007 and May 2008, VON BUDDENBROCK and his co-conspirators facilitated, caused, and allowed the issuance of 11 purchase orders for Russian, Malaysian, and Mongolian honey, including purchase orders 1143, 1145, 1147, 1148, 1149, 1153, 1157, 1168, 1169, 1184, and 1185, when in fact VON BUDDENBROCK knew that the honey was actually Chinese in origin. Containers from 9 of those purchase orders were falsely and fraudulently entered into the United States as Russian and Malaysian, when in fact the honey was Chinese. The declared value upon entry into the United States of the falsely and fraudulently declared honey that VON BUDDENBROCK was personally involved with, or was reasonably foreseeable to him during the course of the conspiracy, was approximately $1,503,043, which caused losses to the United States of approximately $3,322,025 in antidumping duties otherwise applicable to 28 entries of Chinese-origin honey, which consisted of the following:

- 27 entries falsely declared as Russian in origin with a declared value upon entry of approximately $1,387,264, thereby avoiding antidumping duties applicable to Chinese-origin honey of approximately $3,066,130; and

- 1 entry falsely declared as Malaysian in origin with a declared value upon entry of approximately $115,779, thereby avoiding antidumping duties applicable to Chinese-origin honey of approximately $255,894.

10

In addition, between in or about December 2007 and April 2008, VON BUDDENBROCK entered and in other instances, attempted entry and caused others to do so, an additional 56 containers of Chinese-origin honey falsely labeled as Russian, Mongolian, and Malaysian, which had a combined value of approximately $1,424,191 and which if allowed to enter into the United States, would have caused losses to the United States of approximately $3,147,746 in antidumping duties otherwise applicable to Chinese-origin honey.

In total, therefore, VON BUDDENBROCK caused actual losses ($3,322,025) and intended losses ($3,147,746) to the United States of approximately $6,469,771.

### *Introduction and Sale of Adulterated Chinese-Origin Honey*

In about 2007, VON BUDDENBROCK, along with his co-conspirators, knowingly and with intent to defraud and mislead, imported, entered, sold, and delivered honey that was adulterated with antibiotics not allowed in foodstuffs. Specifically, in early 2007, Belten, Liu, Marten, and Giesselbach agreed – and, later informed VON BUDDENBROCK – that because of USA Customer 2's testing standards three adulterated containers of honey from purchase order 1026 adulterated with Norfloxacin could not be delivered to USA Customer 2, and would be re-routed to USA Customer 3, with three unadulterated replacement containers to be sent to USA Customer 2. On or about February 23, 2007, with VON BUDDENBROCK's knowledge, VON BUDDENBROCK's co-conspirators caused ALW USA to arrange the delivery of the three adulterated containers of honey from purchase order 1026 to USA Customer 3, such deliveries occurring between March 8 and March 19, 2007.

11

Also, on or about February 1, 2007, Belten emailed Giesselbach, with a copy to Liu, Marten, and VON BUDDENBROCK, informing them that two containers of honey from purchase order 1052 were adulterated with Norfloxacin. On or about February 2, 2007, Giesselbach responded to the foregoing email and stated: "I know that [USA Customer 5] do [sic] not test FQ [Fluoroquinolones]. If Thomas [Marten] agrees we will accept the containers." In turn, Marten responded to the foregoing email and stated: "Generally, yes we can accept them. . . ." On or about March 26, 2007, with VON BUDDENBROCK's knowledge, VON BUDDENBROCK's co-conspirators caused these two container loads of honey from purchase order 1052 to be delivered to USA Customer 5, knowing that the honey contained Norfloxacin, an antibiotic not approved in food products.

### The Charged Conduct:
### Impeding and Obstructing DOC's Administration of QHD's New Shipper Review

Exporters and producers of Chinese-origin honey that sold honey to the United States market after the DOC's Honey Investigation ended in June 2000, and that were unaffiliated with those that did so during the Honey Investigation, could request a "new shipper" review from the DOC in order to obtain an individual antidumping duty deposit rate. That individualized rate was based on the exporter or producer's own sales information rather than the default antidumping duty deposit rate on Chinese-origin honey.

To qualify as a "new shipper," the DOC required an exporter or producer to certify that it did not export Chinese-origin honey to the United States during the period of the DOC's Honey Investigation and that it was not affiliated with any producers or exporters who did so during that period.

12

If the DOC approved a "new shipper" petition, it issued a preliminary individualized antidumping duty deposit rate. The DOC also issued instructions to CBP to apply the individualized rate to all future importations of Chinese-origin honey that entered the United States from that qualifying exporter or producer until the DOC conducted a subsequent administrative review. If the DOC determined that the sale was not based on normal commercial considerations, or was atypical of the applicant's other sales of comparable merchandise, the DOC could refuse approval and end the review.

Between in or around 2006 and 2008, VON BUDDENBROCK and his co-conspirators supplemented their illegal transshipment activities by creating a new front company, QHD, designed to obtain a lower individualized antidumping duty deposit rate from the DOC's new shipper review process by falsely and fraudulently causing the DOC to find that QHD qualified as a "new shipper" under DOC's review standards and therefore was entitled to bring Chinese-declared honey into the United States under a lower, antidumping duty-exempt rate. Chen (who VON BUDDENBROCK also knew as "George Gao") acted as Sales Manager for QHD and coordinated QHD's new shipper review application before the DOC. VON BUDDENBROCK knew and understood that ALW USA had a preexisting business relationship with Chen, including with Wuhan Shino, a company affiliated with Chen and from which ALW Food Group had purchased millions of dollars of honey between in or about 2005 through in or about 2006.

This new shipper scheme began before VON BUDDENBROCK's employment at ALW USA, but VON BUDDENBROCK continued to carry out the scheme and did do at the

13

instructions of ALW Food Group Executives, including Alexander Wolff. In doing so, VON BUDDENBROCK impeded, obstructed, and influenced the DOC's investigation and the proper administration of QHD's new shipper review. Specifically, from in or about 2006 and 2007, VON BUDDENBROCK and his co-conspirators knowingly and intentionally helped QHD, Chen, and ALW Food Group to create a fraudulent paper trail for the DOC to make it appear that ALW USA and QHD were engaged in new and legitimate transactions, when VON BUDDENBROCK and his co-conspirators knew that the transactions were not legitimate. VON BUDDENBROCK and his co-conspirators prepared, created, maintained, and submitted, and caused to be prepared, created, maintained, and submitted false, fraudulent, and misleading entries, records, and documents, including certifications, purchase orders, invoices, internal costing reports, checks bearing descriptions, and debit notes relating to, and associated with, purchase orders 1010, 1159, and 1174.

For example, on or about March 30, 2007, VON BUDDENBROCK issued a check from ALW USA's bank account in Chicago in the amount approximately $4,491 to a customer describing the payment as a "processing fee" when in fact the check reimbursed the customer the difference between the inflated price and actual price that the customer agreed to pay for the honey from purchase order 1010, which was one of the purchase orders evaluated by the DOC as part of QHD's new shipper review.

In addition, in December 2007 and January 2008, VON BUDDENBROCK was aware of – and approved – Giesselbach creating and submitting three fake and fraudulent debit notes to Wuhan Shino so that Wuhan Shino would reimburse ALW USA $28,430 for moisture, color,

14

and relabeling deficiencies associated with honey from purchase order 1174. These debit notes were fake and fraudulent because they were in fact created to reimburse ALW USA for the antidumping duties, customs duties, and fees ALW USA had paid on the honey it had purchased from QHD on purchase order 1010.

As charged specifically in the superseding information, on January 3, 2008, VON BUDDENBROCK sent an email to Giesselbach asking in German whether ALW USA can debit $28,000 for Wuhan Shino, to which Giesselbach responded in German "Yes, that's the point. Deduct the debit note. I entered it, right? Have to smooth out the other account. Subsequently delete the e mail." VON BUDDENBROCK authorized and approved these fraudulent debit notes and knowingly falsified and made a false entry in ALW USA's corporate records to reflect the fraudulent debit notes, with the intent to impede, obstruct, and influence the DOC's investigation and the proper administration of QHD's new shipper review, and in relation or contemplation thereof.

Also, VON BUDDENBROCK transmitted, received, and reviewed emails with ALW Food Group Executives, Chen and others, in which the conspirators discussed and collaborated with one another to carry out this scheme. For example, among the documents VON BUDDENBROCK received and reviewed was an email from on or about October 29, 2007 from Yi Liu that had been addressed to Giesslebach and Belten, with a copy to Alexander Wolff, that contained the subject line "internal memo***." Attached to the email was a sales contract between ALW Beijing and QHD. The email stated in relevant part:

Dear all:
This is a fake sales confirmation from George Gao [*i.e.*, Chen].

15

He is to use this to show the DOC that he has busy [*i.e.*, business] with Wolff also for Germany besides, USA.
I will make a stamp. And he can use to show the US DOC officer.

VON BUDDENBROCK knew that the attached sales confirmation on the above-referenced email was, as the email states, "fake," and was fraudulently prepared to represent an authentic sales transaction between QHD and ALW USA.

In or around December 2007, as a result of the false, fraudulent, and misleading records and documents VON BUDDENBROCK and his co-conspirators and others, submitted and caused to be submitted to the DOC, the DOC issued QHD a preliminary individualized antidumping duty deposit rate of 0%, which was lower than the default antidumping duty rate on Chinese-origin honey then in effect, and lower than the rate for which QHD actually qualified. On or about December 19, 2007, Giesselbach shared the news with his co-conspirators in an email addressed to VON BUDDENBROCK, with a copy to Wolff, Belten, Liu, and Marten and that contained the subject line "DOC PRELIMINARY - ZERO." The same day, Belten responded to Giesselbach and VON BUDDENBROCK at their personal email accounts, with a copy to Wolff, Liu, and Marten, and instructed them to delete certain documentation and falsify and alter other records, in the event "DOC will come to [the ALW USA] office." In or around December 2007, VON BUDDENBROCK and other ALW Food Group Executives destroyed and attempted to destroy these emails and other documents that would have revealed the fraud, and did so at the direction of ALW Food Group executive Belten.

In summary, VON BUDDENBROCK and his co-conspirators defrauded the United States and committed crimes against the United States, including (i) importing Chinese-origin

16

honey in ways that would illegally avoid U.S.-imposed antidumping duties; (ii) submitting false and fraudulent documents to the DOC as part of QHD "new shipper review process"; and (iii) with intent to defraud and mislead, importing, selling, and delivering into the stream of U.S. commerce Chinese and non-Chinese honey adulterated with prohibited antibiotics.

In turn, VON BUDDENBROCK caused losses to the United States of approximately $3,322,025, intended losses to the United States of approximately $3,147,746, for a total of approximately $6,469,771 in actual and intended losses, in addition to the significant losses that VON BUDDENBROCK and his co-conspirators would have caused to the United States had the government not intervened and stopped the "new shipper" scheme.

7.     The foregoing facts are set forth solely to assist the Court in determining whether a factual basis exists for defendant's plea of guilty and criminal forfeiture, and are not intended to be a complete or comprehensive statement of all the facts within defendant's personal knowledge regarding the charged crimes and related conduct.

## Maximum Statutory Penalties

8.     Defendant understands that the charge to which he is pleading guilty carries the following statutory penalties:

a.     A maximum sentence of 20 years' imprisonment. This offense also carries a maximum fine of $250,000, or twice the gross gain or gross loss resulting from that offense, whichever is greater. Defendant further understands that the judge also may impose a term of supervised release of not more than three years.

17

b.  Defendant further understands that the Court must order restitution to the victim of the offense in an amount determined by the Court. The Court also may order restitution to any persons as agreed by the parties.

c.  In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on the charge to which he has pled guilty, in addition to any other penalty or restitution imposed.

### Sentencing Guidelines Calculations

9.  Defendant understands that in imposing sentence the Court will be guided by the United States Sentencing Guidelines. Defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

10.  For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

a.  **Applicable Guidelines.** The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2011 Guidelines Manual.

b.  **Offense Level Calculations.**

i.  The base offense level for the charge in the superseding information and stipulated offense described above, is 24 pursuant to Guidelines §§ 2T3.1(a)(1) and 2T4.1(J)

18

because the loss and intended loss in antidumping duties, that is, approximately $6,469,771, exceeded $2.5 million but was less than $7 million.

        ii.     Pursuant to Guideline §2T1.1(b)(2), defendant's offense level is increased by 2 levels because defendant's offense and stipulated conduct involved sophisticated means.

        iii.    Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline §3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to his ability to satisfy any fine or restitution that may be imposed in this case, a two-level reduction in the offense level is appropriate.

        iv.    In accord with Guideline §3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline §3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

        c.    **Criminal History Category.** With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the

government, defendant's criminal history points equal zero and defendant's criminal history category is I.

        d.    **Anticipated Advisory Sentencing Guidelines Range.** Therefore, based on the facts now known to the government, the anticipated offense level is 23, which, when combined with the anticipated criminal history category of I, results in an anticipated advisory Sentencing Guidelines range of 46 to 57 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose.

        e.    Defendant and his attorney and the government acknowledge that the above Guideline calculations are preliminary in nature and based on facts known to the parties as of the time of this Plea Agreement. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

        f.    Both parties expressly acknowledge that while none of the Guideline calculations set forth above are binding on the Court or the Probation Office, the parties have agreed pursuant to Fed.R.Crim.P. 11(c)(1)(B) that certain components of those calculations – specifically, those set forth above in subparagraph (b) of this paragraph – are binding on the parties, and it shall be a breach of this Plea Agreement for either party to present or advocate a position inconsistent with the agreed calculations set forth in the identified subparagraph.

20

g.      Defendant understands that with the exception of the Guideline provisions identified above as binding on the parties, the Guideline calculations set forth above are non-binding predictions, upon which neither party is entitled to rely, and are not governed by Fed.R.Crim.P. 11(c)(1)(B). Errors in applying or interpreting any of the Sentencing Guidelines (other than those identified above as binding) may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the Guidelines. The validity of this Plea Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Plea Agreement, on the basis of such corrections.

## Cooperation

11.      Defendant agrees he will fully and truthfully cooperate in any matter in which he is called upon to cooperate by a representative of the United States Department of Justice. This cooperation shall include providing complete and truthful information in any investigation and pre-trial preparation and complete and truthful testimony in any criminal, civil or administrative proceeding in any district in the United States, including any proceedings in the Northern District of Illinois or in any foreign proceeding if requested to do so by a representative of the United States Attorney's Office for the Northern District of Illinois.

## Agreements Relating to Sentencing

12.      At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation.   If the government moves the Court, pursuant to

21

Sentencing Guideline § 5K1.1, to depart from the applicable Guideline range, as set forth in the preceding paragraph, this Agreement will be governed, in part, by Federal Rule of Criminal Procedure 11(c)(1)(C). That is, the parties have agreed that the sentence imposed by the Court shall not include a term of imprisonment in the custody of the Bureau of Prisons of more than 60 months. Furthermore, if the government determines that defendant has continued to provide full and truthful cooperation as required by this plea agreement, then the government shall move the Court, pursuant to Guideline §5K1.1, to depart downward from the low end of the applicable guidelines range, and shall recommend a sentence that includes a term of imprisonment in the custody of the Bureau of Prisons of 50 percent of the low end of the applicable guidelines range determined by the Court, and if that number is higher than 60 months, that defendant be sentenced to 60 months. Defendant shall be free to recommend any sentence. Defendant understands that the decision to depart from the applicable guidelines range rests solely with the Court. Defendant further acknowledges that if the Court does not accept the government's sentencing recommendation, defendant will have no right to withdraw his guilty plea. If the Court accepts this plea agreement, including the parties' agreement that any term of imprisonment not exceed 60 months, defendant may not withdraw this plea as a matter of right under Federal Rule of Criminal Procedure 11(d) and (e). If, however, the Court refuses to limit the term of incarceration to 60 months as set forth in this paragraph, thereby rejecting this plea agreement, or otherwise refuses to accept defendant's plea of guilty, either party has the right to withdraw from this plea agreement.

22

13.     If the government does not move the Court, pursuant to Sentencing Guideline § 5K1.1, to depart from the applicable Guideline range, as set forth above, this plea agreement will not be governed, in any part, by Federal Rule of Criminal Procedure 11(c)(1)(C), the preceding paragraph of this plea agreement will be inoperative, both parties shall be free to recommend any sentence, and the Court shall impose a sentence taking into consideration the factors set forth in 18 U.S.C. § 3553(a) as well as the Sentencing Guidelines without any downward departure for cooperation pursuant to §5K1.1. Defendant may not withdraw his plea of guilty because the government has failed to make a motion pursuant to Sentencing Guideline §5K1.1.

14.     Regarding restitution, defendant agrees to pay restitution, arising from the stipulated offense conduct set forth above, totaling $500,000, to the United States, pursuant to Title 18, United States Code, §§ 3663(a)(3) and 3664.

15.     Restitution shall be due immediately, and paid pursuant to a schedule to be set by the Court at sentencing. Defendant acknowledges that the cash bond posted with the Clerk of the District Court in his name and for his benefit, is to serve as a source of funds for immediate restitution as agreed in the preceding paragraph. As agreed in the preceding paragraph, defendant will take all steps necessary to have those funds transferred from the Clerk's Office directly to the appropriate component, agency, or department of the United States for purposes of restitution. Defendant further acknowledges that pursuant to Title 18, United States Code, Section 3664(k), he is required to notify the Court and the United States Attorney's Office of any material change in economic circumstances that might affect his ability to pay restitution.

23

Defendant further agrees to cooperate with the United States Attorney's Office in collecting defendant's restitution as set forth in the preceding paragraph.

16.     Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

17.     Defendant agrees that the United States may enforce collection of any fine or restitution imposed in this case pursuant to Title 18, United States Code, Sections 3572, 3613, and 3664(m), notwithstanding any payment schedule set by the Court.

18.     After sentence has been imposed on the count of conviction, the government will move to dismiss the forfeiture allegations as to defendant.

### Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Plea Agreement

19.     This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 08 CR 417-10.

20.     This Plea Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver or release by the United States or any of its agencies of any administrative or judicial civil claim, demand or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities, except as expressly set forth in this Agreement.

24

## Waiver of Rights

21.     Defendant understands that by pleading guilty he surrenders certain rights, including the following:

a.     **Right to be charged by indictment.**  Defendant understands that he has a right to have the charge  prosecuted by an indictment returned by a concurrence of twelve or more members of a grand jury consisting of not less than sixteen and not more than twenty-three members.  By signing this Agreement, defendant knowingly waives his right to be prosecuted by indictment and to assert at trial or on appeal any defects or errors arising from the information, the information process, or the fact that he has been prosecuted by way of information.

b.     **Trial rights**.  Defendant has the right to persist in a plea of not guilty to the charge against him, and if he does, he would have the right to a public and speedy trial.

i.     The trial could be either a jury trial or a trial by the judge sitting without a jury.  Defendant has a right to a jury trial.  However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii.     If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random.  Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

25

        iii.     If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt. The jury would have to agree unanimously before it could return a verdict of guilty or not guilty.

        iv.     If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

        v.     At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

        vi.     At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

        vii.     At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

        c.     **Waiver of appellate and collateral rights.** Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial. Defendant is aware that Title 28, United States Code, Section 1291, and Title 18, United

States Code, Section 3742, afford a defendant the right to appeal his conviction and the sentence imposed. Acknowledging this, defendant knowingly waives the right to appeal his conviction, any pre-trial rulings by the Court, and any part of the sentence (or the manner in which that sentence was determined), including any term of imprisonment and fine within the maximums provided by law, and including any order of restitution, in exchange for the concessions made by the United States in this Plea Agreement. Defendant also waives his right to challenge his conviction and sentence, and the manner in which the sentence was determined, and (in any case in which the term of imprisonment and fine are within the maximums provided by statute) his attorney's alleged failure or refusal to file a notice of appeal, in any collateral attack or future challenge, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel, which relates directly to this waiver or to its negotiation, nor does it prohibit defendant from seeking a reduction of sentence based directly on a change in the law that is applicable to defendant and that, prior to the filing of defendant's request for relief, has been expressly made retroactive by an Act of Congress, the Supreme Court, or the United States Sentencing Commission.

        d.     Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

## **Presentence Investigation Report/Post-Sentence Supervision**

22.     Defendant understands that the United States Attorney's Office in its submission

to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise

the District Court and the Probation Office of the nature, scope and extent of defendant's conduct

regarding the charge against him, and related matters.  The government will make known all

matters in aggravation and mitigation relevant to sentencing.

23.     Defendant agrees to truthfully and completely execute a Financial Statement (with

supporting documentation) prior to sentencing, to be provided to and shared among the Court,

the Probation Office, and the United States Attorney's Office regarding all details of his financial

circumstances, including his recent income tax returns as specified by the probation officer.

Defendant understands that providing false or incomplete information, or refusing to provide this

information, may be used as a basis for denial of a reduction for acceptance of responsibility

pursuant to Guideline §3E1.1 and enhancement of his sentence for obstruction of justice under

Guideline §3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section

1001 or as a contempt of the Court.

24.     For the purpose of monitoring defendant's compliance with his obligations to pay

a fine and restitution during any term of supervised release or probation to which defendant is

sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and

the United States Attorney's Office of defendant's individual income tax returns (together with

extensions, correspondence, and other tax information) filed subsequent to defendant's

sentencing, to and including the final year of any period of supervised release or probation to

which defendant is sentenced. Defendant also agrees that a certified copy of this Plea Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

## Other Terms

25. Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine and restitution for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

26. Defendant recognizes that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense to which defendant is pleading guilty. Removal and other immigration consequences are the subject of a separate proceeding, however, and defendant understands that no one, including his attorney or the Court, can predict to a certainty the effect of his conviction on his immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his guilty plea may entail, even if the consequence is his automatic removal from the United States.

## Conclusion

27. Defendant understands that this Plea Agreement will be filed with the Court, will become a matter of public record and may be disclosed to any person.

28. Defendant understands that his compliance with each part of this Plea Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this

Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

29.     Should the judge refuse to accept defendant's plea of guilty, this Plea Agreement shall become null and void and neither party will be bound thereto.

30.     Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Plea Agreement to cause defendant to plead guilty.

30

31.     Defendant acknowledges that he has read this Plea Agreement and carefully

reviewed each provision with him *his* attorney. Defendant further acknowledges that he understands

and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: ___3/22/2012___

_____
PATRICK J. FITZGERALD
United States Attorney

_____
ANDREW S. BOUTROS
Assistant U.S. Attorney

_____
WILLIAM R. HOGAN, JR.
Assistant U.S. Attorney

_____
MAGNUS VON BUDDENBROCK
Defendant

_____
JEFFREY STEINBACK          RACHEL KATZ
Attorney for Defendant

31